### The City of Atlanta.[1]

### The D. J. Foley.

*(District Court, S. D. New York. January 28, 1886.)*

1. COLLISION—TWO STEAMERS—FOG-WHISTLE—ERROR IN LOCATING DIRECTION—FAILURE TO STOP AND REVERSE.

Two steamers, the F. and the A., approaching each other about head on, in the night and fog, first heard each other's whistles when about half a mile apart, but mistook their direction; the F. locating the A.'s whistle about four points on her starboard bow, the A. estimating the whistle of the F. to come from some one or two points on her port bow. The A. ported, shortly afterwards stopped, and, on seeing the lights of the F., reversed full speed. The F. starboarded, and when she saw the lights of the A. increased her speed to cross the bows of the latter. A collision followed, the bow of the A. striking the starboard quarter of the F. *Held* that, while error in locating the sound of a whistle in a fog is not in itself a fault, nor is it a fault to steer away from the

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

apparent direction of the sound, provided this is accompanied by the order to stop and reverse, if near, (*The Lepanto*, 21 Fed. Rep. 651,) in this case both vessels were in fault for not backing as soon as the repeated exchanges of whistles showed that they were approaching each other.

2. SAME—DEPARTURE FROM RULE—RISK—RULE 18.

A steamer that fails to stop and reverse, as required by article 18 of the rules of navigation, when risk of collision is obvious, takes on herself the risk of the departure from the rule.

3. SAME—FOG—MODERATE SPEED—NINE KNOTS—ARTICLE 13, RULES OF NAVIGATION.

Moderate speed means reduced speed. Therefore, where the steamer A., whose full speed was nine knots, was moving at that rate in a fog, through which lights could be seen about a quarter of a mile only, and came in collision, *held*, that she was sailing in violation of article 13 of the rules of navigation, and her speed was a fault that contributed to the collision.

In Admiralty.

*Benedict, Taft & Benedict*, for the City of Atlanta.

*Parrish & Pendleton*, for the D. J. Foley.

BROWN, J. The above cross-libels were filed by the owners of the steam-propellers City of Atlanta and D. J. Foley, to recover their respective damages arising from a collision, about 50 miles off the Virginia coast, at about 2:40 A. M., on the twenty-ninth of March, 1885. The stem of the City of Atlanta struck the starboard quarter of the Foley at an angle of from two to three points, about 35 feet from the stern, breaking in a hole about 15 inches deep. Two other slight blows were given afterwards, which broke the rail at two points nearer the stern.

The City of Atlanta was 260 feet long, and of about 1,680 tons burden, bound from Charleston to New York. The Foley was 155 feet long, 541 tons burden, and bound from Philadelphia to Jamaica. At the time of the collision a fog was prevailing, but not dense. The chief officers of both steamers agree that they saw each other's white lights when from 500 to 600 yards apart, and almost immediately afterwards saw each other's colored lights also. The wind was light, from the S. S. W., and the sea smooth. Shortly prior to the collision the Foley was making her course due S. Her full speed in a smooth sea was from eight to nine knots. At 11 P. M. the weather had begun to grow thick with fog. It occasionally lifted. At 2 A. M. one could see lights from five to six miles. When the fog came on, the steam pressure had been slackened so as to give, instead of 68 or 70 revolutions per minute, her full speed, only about from 50 to 55 revolutions, which the captain testifies gave her from five to six knots; but the proportion of revolutions stated would make about six and one-third knots. According to the Foley's witnesses, while she was going at this speed due S., the first officer being in charge of the navigation, and blowing regular blasts of the fog-horn about one minute apart, the fog-horn of the City of Atlanta was heard upon the starboard bow. It was answered by a long whistle from the Foley, and her helm was put hard to starboard. Other whistles were given and heard, the City of Atlanta being judged to be about four points off the

starboard bow. The Foley's wheel was kept hard a-starboard until she had veered six points to E. S. E., when her wheel was steadied. At that time the white light and the red light of the City of Atlanta first came into view, bearing nearly abeam, and estimated to be from 500 to 600 yards distant. The master of the Foley then rang a jingle bell, and the engine was put full speed ahead. The helm was kept steady until she was struck by the stem of the City of Atlanta on her starboard quarter, as above stated. At that time the Foley was heading E. by S.

The average full speed of the City of Atlanta was nine knots. Up to the time when the fog-horn of the Foley was heard, she had not materially slackened her speed on account of the fog. Her course was N. by E. She was sounding her fog signal at regular intervals, as required, and heard one blast from the Foley, estimated to be two or three points on the port bow. She answered with one signal and ported. Another whistle was soon heard from the Foley, when the helm was put hard a-port, and the engines stopped. The white light and the green light of the Foley afterwards came into view, estimated to be about 500 or 600 yards distant, when the City of Atlanta, under her port helm, had swung from three to four points to the eastward, and the Foley's lights bore about four points on her port bow. As soon as the Foley's lights came into view, the engines of the City of Atlanta were reversed full speed; so that, at the moment of the collision, she was estimated by her own witnesses to be going not to exceed the rate of two or three knots. Their estimate of the time is that the collision occurred from two to two and one-half minutes after the order to reverse, and that the first fog-horn was heard from one and one-half to two minutes before backing. The wheelsman testified that at the time of the collision the City of Atlanta was heading between E. N. E. and N. by E. Before colliding, the bowsprit of the City of Atlanta fouled in the main rigging of the Foley, which probably carried her off at least half a point to the eastward before the blow.

As the two vessels upon their prior courses differed only one point from each other, it is manifest that one or the other mistook considerably in locating the direction of the fog signals heard by them. Considering their speed, and the courses sailed by both under their respective changes of helm, it is at once apparent that they could not have differed much in their longitude. If the City of Atlanta was four points off the starboard bow of the Foley when the fog signals were first heard, the Foley must have been nearly three points on the starboard bow of the City of Atlanta, instead of two or three points on her port bow, as the latter's witnesses estimated. If the latter judgment was correct, then the City of Atlanta must have been in reality one or two points on the Foley's port bow, instead of upon her starboard bow. Notwithstanding some evidence to the effect that the City of Atlanta was located four points on the Foley's starboard bow

when the whistle was first heard, there are numerous other circumstances which convince me that this supposed bearing was not arrived at until at least the second whistle was heard, and after the Foley had starboarded her helm.

Some additional facts testified to make it possible to project a diagram, approximately correct, of the courses of the vessels up to the point of collision. The Foley, it appears, under her helm hard over, would make a circle of about 1,500 feet diameter; the City of Atlanta, a circle of about twice that diameter. The Foley would therefore make her six points of change up to the time when she saw the other steamer's lights in going 900 feet; that is, at her rate of speed, in a little less than a minute and a half. During this period the City of Atlanta, (whose helm, according to the testimony, would seem to have been ported at about the same time that the Foley's was starboarded,) at the average rate of eight and one-half knots under her slow bell, would make about 1,200 feet, or four points change. This is a somewhat greater change than that estimated by her witnesses up to the time when the Foley's lights were seen; but, considering that she then immediately reversed her propeller, and that the change in her heading thereafter was necessarily comparatively slight, except under the swing that she already had, I think two points of change during the subsequent interval, up to the collision, making five and one-half points in all, is quite as much as was probably made afterwards, leaving a change of three and one-half points up to the time when the vessels sighted each other. In that situation, their courses differing by five points, even if they were but 500 yards apart, they could not have come together, at the speed they were going, in less than two minutes; and, as the Foley's speed was increasing, and that of the City of Atlanta diminishing under the latter's reversed propeller, there could not have been any great difference in the distance each traveled from the time when her lights were seen up to the moment of collision. A drawing made upon these elements, which cannot be greatly amiss, will show that the City of Atlanta was really nearly directly ahead of the Foley, and less than two-thirds of a mile distant, when their signals were first heard by each other.

The most important contradiction in the case relates to the signal of two blasts of the whistle given by the Foley in accordance with article 19 of the new international rules, (act of March 3, 1885; chapter 354, 23 St. at Large, p. 441,) indicating that she would go to port. Some of the evidence on the trial is to the effect that this signal given by the Foley was in answer to a similar signal of two blasts heard by her from the City of Atlanta. Not only, however, do the witnesses from the latter vessel deny that they gave any such signal of two blasts, but various portions of the testimony on the part of the Foley—her log, the first report of the collision, and finally the averments of the libel itself—do not present any such account of the matter. They indicate, on the contrary, that the two blasts given by the Foley were given by her without any such previous signal from the City of Atlanta.

Nor is it credible that, under the new rules, the City of Atlanta, having heard the Foley's fog-whistle, should have given a signal of two blasts, indicating that she was going to port, while, at the same moment, as the proof clearly shows, she ported her wheel to go to starboard. The various statements of the Foley's witnesses as to the whistles given and heard, and the order of them, are all more or less different. The minds of the witnesses would not, at the time, be specially charged to remember those details accurately, and it is very plain that they do not. The testimony of the witnesses of the City of Atlanta is, moreover, to the effect that no signal of two blasts was heard until about the time that the lights of the Foley came into view. The City of Atlanta then answered with one whistle; because, as her master states, the Foley bore four or five points off his port bow, and it was impossible for him to avoid the Foley by going to port. Under such circumstances the strongest weight, in my judgment, is to be given to the contemporaneous actions of the persons in charge of their respective vessels, who were fully competent, and cannot be supposed to have acted most irrationally without cause. Had any signal of two whistles from the Foley been heard by the City of Atlanta soon after the first signal from her was heard, and before the Foley's lights were seen, it is in the highest degree improbable that the master of the City of Atlanta would have continued to bear to the eastward without instantly reversing, as such a signal would indicate that the Foley was also going to the eastward, thereby increasing the chances of collision. I think the probability is, therefore, that the two whistles from the Foley were not given until the time, or about the time, when their lights became visible to each other. This is to some extent confirmed by the testimony of the Foley's mate. In one part of his testimony he states that he first blew a long blast in answer to the City of Atlanta's whistle. Then he heard the latter blow again, about four points on his starboard bow, and that it was after that that he blew his two whistles. If a signal of two sharp blasts were given by the Foley soon after the first signal was heard from the City of Atlanta, I think it clear that they were not heard on the City of Atlanta.

I have made these observations in regard to the vessels' signals, not so much on account of their final importance in respect to the faults of the vessels, as on account of the diversity that appears in the evidence, and the very considerable stress laid upon them in the argument.

In ascertaining the true causes of the collision, the first important point is to determine the relative bearings of these vessels, and their probable distance from each other, at the time when their whistles were first heard. There is little doubt that these whistles were heard by each at about the same time; that of the City of Atlanta, as the larger vessel, being probably heard first on the Foley, and immediately answered by a long blast from the latter, which was heard upon the City of Atlanta. The direction of their courses up to the

time of the collision, as stated in the testimony of each, leaves no doubt that, at the time when the first whistles were exchanged, the City of Atlanta was very nearly directly ahead of the Foley, and probably on her starboard bow, less than a quarter of a point, and the latter about a point only on the former's port bow. Both mistook considerably in locating the sound of the other's whistle. The Foley erred several points; the City of Atlanta, from one to two points.

In the case of *The Lepanto*, 21 Fed. Rep. 651, 656, 658, I have said all it seems to me necessary to be said here in reference to such accidents. Subsequent cases before me confirm the views there expressed in reference to the liability to collision through mistake in locating sounds in a fog, and the full knowledge of this liability that mariners possess; though some mariners, it appears, claim the contrary. *The Alberta*, 23 Fed. Rep. 807, 810. Such errors, however, are not in themselves faults; and, as held in the case of *The Lepanto*, I cannot hold it a fault to steer away from the *apparent* direction of the sound, provided this is also accompanied by the order to stop and reverse at full speed, whenever the signal seems near, which includes any distance less than a mile for vessels going at considerable speed. In the present case, although each steered away from the apparent source of the sound, neither reversed at once, and the Foley did not reverse at all.

This case differs, however, from most others of this character, in that the fog was much less dense. The lights of the vessels, it is contended, could be distinguished upwards of a quarter of a mile distant, though there is doubtless some uncertainty on this point. But this distance is manifestly insufficient for safe maneuvering in the situations which are likely to arise. Article 13 of the new regulations, which requires that "every ship, whether a sailing ship or a steamship, shall, in a fog, mist, or falling snow, go at a moderate speed," must be held applicable in all cases where the fog is such as to diminish very materially the distance at which vessels can ordinarily be distinguished for the purpose of avoiding collisions. The rule must be applied whenever the space within which lights can be seen is insufficient for vessels to avoid each other, in the conditions which are likely to arise, or under the mistakes that may have been previously made as to each other's position, bearing, or course. "Moderate speed" means "reduced speed." *The City of New York*, 15 Fed. Rep. 624. The City of Atlanta did not substantially reduce her speed at all, although she was sounding fog-signals. She was sailing, therefore, in violation of article 13 of the rules of navigation. That this violation of the rule was a fault that contributed to the collision is clear from the evident fact that had her previous speed been substantially moderated to, say, six knots, her subsequent reversal would have enabled her to avoid this collision. It was her previous full speed, in violation of the rule, that rendered her slowing, when the whistle was heard, and her reversal as soon as the Foley was seen, ineffectual. Her speed was therefore a fault that con-

tributed to the collision. *The City of New York*, 15 Fed. Rep. 624, 627, 628; *The Warren*, 25 Fed. Rep. 782; *The State of Alabama*, 17 Fed. Rep. 847, 852. I must consider it a further fault on her part that she did not immediately stop and back when the Foley's whistle was heard, instead of merely slowing. Nine knots an hour is not necessarily and for all ships an immoderate speed. It depends upon the power they have in reserve for immediately stopping. *The State of Alabama, supra*. The City of Atlanta did, indeed, slow; but, considering that she had not previously moderated her speed at all, she was bound to reduce it immediately, and as much as possible, within the limits of fair steerage-way, after hearing the Foley's whistle somewhat near, and until the danger was passed. The whistles, when first heard, were not at such an apparent distance as made delay justifiable considering her previous full speed. They were not estimated at the time to be above half a mile apart, and as it appears from the proofs such was the fact. That, in the nautical sense, was near. The second whistle showed that she was approaching *nearer*. In such situations it is the duty of both to stop and reverse at once. *The John McIntyre*, 9 Prob. Div. 135; *The Beryl*, Id. 137; *The Alberta*, 23 Fed. Rep. 807; *The Pottsville*, 24 Fed. Rep. 655.

The Foley had, indeed, previously slackened her speed from about eight and one-half knots, her full speed, to probably six and one-half knots, or thereabouts. Excepting this, she is chargeable with the same general faults as the City of Atlanta. She knew from the repeated whistles of the City of Atlanta that the vessels were approaching each other nearer and nearer, and it was then her duty before the two came in sight of each other at once to stop and reverse. Not only was this duty omitted, but when the vessels came in sight of each other, possibly a quarter of a mile distant, and when risk of collision was obvious, she did not stop and reverse as required by article 18, but rang her jingle bell to go at full speed. In violating the rule, she took on herself the risk of departing from it. *The Elizabeth Jones*, 112 U. S. 514; S. C. 5 Sup. Ct. Rep. 468; *The Alaska*, 22 Fed. Rep. 548, 553; *The Arklow*, 9 App. Cas. 136; *The Agra*, L. R. 1 P. C. 501. Her situation at that time was by no means a situation *in extremis*. Had she complied with the rule, there is no question that the collision which occurred at least two minutes later, and after she had gone from 1,200 to 1,400 feet further, would have been avoided. She disobeyed the rule under no apparent necessity, and must accordingly be charged with the loss, equally with the City of Atlanta. Her master does, indeed, testify that, when first seen, the City of Atlanta's lights bore two points aft of abeam of the Foley. But a drawing of their courses backwards from the collision will show that that bearing is impossible. I have no doubt the bearing was at least two points *forward* of abeam, as her log actually reads, and that the testimony as to mistake in the log is erroneous.

There must be a decree dividing the damages and costs in both