## THE CHERUSKIA.

### (District Court, S. D. New York. March 8, 1899.)

1. COLLISION—LIGHTS—SHIP NOT UNDER COMMAND.

   Article 4 of the sailing rules, requiring two vertical red lights to be exhibited by a ship when not under command, refers to vessels in some way disabled, and does not apply to a brigantine which was simply moving very slowly in a light wind, though she had not complete steerageway for all maneuvers, but sufficient to keep her course.

2. SAME—EXCESSIVE SPEED IN FOG.

   Where the full speed of a steamer was 10½ or 11 knots, a reduction of from 1 to 1½ knots in a fog still leaves the speed excessive. The reduction, even in a moderate fog, should be at least to two-thirds of full speed.

3. SAME—STEAMSHIP AND SAILING VESSEL—CROSSING OR OVERTAKING—SIGNAL LIGHTS—EVIDENCE CONSIDERED.

   Evidence considered in relation to a collision between the German steamship Cheruskia and the British brigantine R. L. T. at sea, in the evening, during a fog, by which the brigantine was lost, and *held* to show that the steamship alone was in fault as a crossing and not an overtaking vessel, and that no signal lights were required.

This was a libel by Edward E. Hutchings and others against the steamship Cheruskia to recover damages for collision.

Everett P. Wheeler and Charles S. Haight, for claimant.

Eustis, Jones & Govin and Mr. Benedict, for libelants.

BROWN, District Judge. The above libel was filed to recover the damages arising from a collision between the British brigantine R. L. T. going southerly and the German steamship Cheruskia going westerly, which took place to the southward of Nantucket Shoals lightship in a low but not very dense fog on the evening of July 4, 1898, at about 9:15 p. m. The brigantine was struck on her port quarter a little aft of the main rigging by the stem of the steamer within two or three points of a right angle. A large hole was knocked in her side and she speedily careened on her beam ends, turning to port, and being light, she drifted away without sinking, her officers and crew being rescued on the steamer.

The weather was nearly calm, so that the sailing vessel had little motion, though most of her sails were set and closehauled with the wind from W. to W. by S. on her starboard side. The fog was low, and such that lights could be seen about one-fourth of a mile to one-third of a mile distant; while it was clear and bright starlight above. The brigantine was in charge of the mate at the time, the captain being below. The captain's son and another seaman were forward, the latter acting as lookout, the former blowing a mechanical fog horn. A negro seaman was at the wheel. The course as given an hour before was S. by W., but so light was the wind that for more than an hour before collision the helm had been kept hard down, the vessel coming up and falling off, as the seaman testifies, about half a point from time to time. The two high white lights of the steamer were first seen from the brigantine, variously estimated from quarter of a mile to one-half a mile or more distant. The seamen forward estimate the distance at from 800 yards to one-half a mile, and say that immediately afterwards her green light was

seen about abeam on the port side. The mate saw first the white lights and then the colored lights dead abeam, as he says, and estimated to be about 1,500 feet off. About 1½ minutes afterwards, as he estimates, he called the master, who coming at once on deck, saw, as he says, the steamer's green light about three lengths distant, i. e. about 400 feet. This was estimated by him and the mate to be about 2 minutes before collision. The distance at that time was probably about 1,000 feet instead of 400. None of the seamen speak of seeing the red light except the wheelsman, who afterwards said he did not know what he saw. All say that the steamer seemed to come straight towards them from about abeam and without any material change in speed. The captain and mate were thrown down by the shock of collision, and the captain had some ribs broken by the fall.

On board the Cheruskia, running W. ⅞ S., a blast of the brigantine's fog horn was first indistinctly heard, and the wheel was immediately ordered hard aport. A few seconds afterwards her red light was seen about two points on the steamer's starboard bow and the order to slow was given, followed 10 seconds afterwards, as the master says, by the orders to stop and reverse which were received so nearly together that they were entered in the engine room as one order at 9:14 and immediately obeyed, and the order to stop reversing was received at 9:17, which was probably about half a minute after collision. The time of reversing was, therefore, from about 1¾ minutes to 2 minutes before collision. Under her port wheel and while reversing the steamer swung from 3 to 5 points to starboard. The master's statement that she swung 3 points to starboard before reversing, is inconsistent with the other testimony and is probably an error. When the brigantine's red light was first seen it was estimated by the master to have been from 400 to 600 meters distant; by the mate, 400 meters. The maneuvers indicate that it was about a quarter of a mile, and could not have been much more. Soon after the red light was seen the brigantine herself was distinguished. The full speed of the steamer, as she was running before entering the fog, was about 10½ or 11 knots; but at 9:04 p. m. on running into the fog, the order "Attention" i. e. to stand by, was sent to the engine room, which meant a reduction of about 1½ knots in speed by changes in the drafts. But the assistant engineer, who was alone in the engine room at that time, says that on this occasion he made no changes in the draft or any actual reduction in speed, but waited for the next order. The master estimated that the steamer could be stopped from 9 or 10 knots in going 600 feet, but he is mistaken in this supposition. Stopping from full speed in 3½ minutes, she would advance about 550 yards; and from 10 knots speed, at least 400 yards. The steamer was running upon a course heading W. ⅞ S.

For the defense, it is contended that the steamer's speed was not excessive in so light a fog; that her speed had been reduced to 9½ knots and that lights could be seen at an abundant distance to enable her at that speed to avoid other vessels; and that the explanation of the collision is (1) that the steamer was overtaking

the brigantine, coming up from behind the range of her red light, and that the brigantine failed to exhibit a flare-up light or a white light over her stern, as required by new article 10; and (2) that the brigantine was unmanageable from lack of wind, and was not under command, nor making any substantial headway; and should therefore have exhibited 2 vertical red lights visible all around the horizon, as required by article 4.

As to the last point, the testimony of the captain is quite positive. He says that the wind was W. or W. by S.; that there was "quite a breeze at 4 o'clock and we tied up some light sails and tied a reef in the mainsail. It commenced to die out just about sundown." He went below soon after 8 o'clock, and he testifies:

"At that time I suppose she was going about ¾ of a mile an hour, but the wind was dying out all the while."

In answer to the question: "Q. Did you give any order in regard to handling the ship when you came on deck, a few moments before the collision," he answered as follows:

"A. No, we couldn't handle our ship, our ship was unmanageable at that time. We couldn't answer the helm, we could neither way nor steer.

"Q. She couldn't have changed her course if she had wanted to? A. No, I guess not.

"Q. Didn't you know that she didn't have steerageway as soon as you came on deck? A. I knowed that she was unmanageable as soon as I got on deck.

"Q. Before you had asked the question? A. Oh, yes."

The captain's son who was forward blowing the fog horn testifies:

"Q. Did you notice how fast she was going? A. She wasn't going ahead at all, wasn't going not more than a mile an hour, didn't have no steerage on her."

The fact that she did not have proper steerageway is further shown by the testimony that before the watch was changed at 8 o'clock, the helm had been put hard down and was kept down; and Britto, who was at the wheel from 8 o'clock until the collision, testifies on this point as follows:

"Q. How was the wind? A. I couldn't tell you how the wind was; the wheel was down all my watch. We were under short canvas; we did not alter the wheel at all from the time I relieved the man.

"Q. Did you follow the same course or did you change it? A. The wheel was down; she came up half a point and went off half a point. * * * The man said go by the wind. We were going S. S. W. or something like that; * * * followed the same course; it went off half a point and up half a point."

From this it is probable that the vessel was not moving over a mile an hour, as I do not credit the mate's estimate of 2 to 3 knots. Had the steamer been aware of this slow speed she would naturally have kept on without stopping or porting; and having the brigantine 2 points on her starboard bow when nearly ¼ of a mile distant, she would have gone ahead of her by several hundred feet, even without starboarding her wheel.

I do not think the brigantine, however, was "not under command," in the sense of article 4. I understand that article to refer to vessels in some way disabled, so as to be no longer under control. That was not the situation of the brigantine. She was in perfect condition.

She was simply moving very slowly in a light wind. She had not complete steerageway for all maneuvers. She could not change her tack by luffing; but she could do so by wearing around. She was substantially keeping her course and had sufficient steerageway for that purpose, whether making only ¾ of a knot, or from 2 to 3 knots as the mate testifies. I think article 4 is not applicable to such a case.

1. Upon the facts as above found the steamer must be held to blame for this collision, because her speed was not materially reduced from full speed. The testimony of the officers and the entry in the log of reduced speed under the order of "Attention," are based only upon inference from the ordinary practice to reduce speed on that order 1 or 1½ knots. But the assistant engineer's testimony shows that the ordinary practice under that order was in this instance not observed. But even had the ordinary reduction under the order "Attention" been made, I should have been bound under the authorities to hold a speed so near to full speed to be excessive in so considerable a fog as hung upon the water at that time.

At the moment of collision the speed of the Cheruskia must have been greatly reduced or she would have cut off the stern of the brigantine. The officers of the steamer think she was nearly stopped; but the blow was too severe to admit of that conclusion, and the brigantine was turned around towards the port side of the steamer as she backed away. I think she was still moving at the rate of 3½ or 4 knots, to which speed she would naturally be reduced in the 1¾ minutes of actual reversal before collision, advancing during this interval from 300 to 400 yards. Had she been going at even "half speed," i. e. about 7½ knots or about two-thirds of full speed,— as much as is justifiable in moderate fog,—the collision would have been avoided. See The Chattahoochee, 173 U. S. 540, 19 Sup. Ct. 491.

2. The contention that the steamer was overtaking the brigantine and coming up astern of the range of the latter's red light, so that it was incumbent upon the brigantine to exhibit a flare-up light, or a white light from her stern, under article 10, was not set up in the original answer. It was interposed by amendment at the trial. Most of the libelants' testimony had been taken previously, by depositions, at a time when no such defense was raised; and it has therefore in its favor the merit of not being given with any reference to this defense. All the direct testimony on the libelants' part, however, is opposed to such a situation of the two vessels. The libelants' witnesses all speak of seeing the steamer's lights, from the first, either abeam or nearly so. The mate, indeed, testified on the last day of the trial that he observed his own heading to be by compass S. by W. and the steamer's bearing from him to be E. by S. when her lights were seen. This would place her exactly abeam; and this I find would very nearly correspond with the computed position of the steamer when 500 yards distant from him, assuming, as the mate says, that the brigantine's heading was S. by W. and that the steamer swung four points to starboard and pointed at collision, as the weight of testimony indicates, including the steamer's witnesses, two points aft of the brigantine's beam, i. e. two points towards her stern.

From the testimony of the defendant's experts that the brigantine could head within five points of the wind, it is argued that the wind was W. and the consequent heading of the brigantine S. W. by S. With that heading of the brigantine, the steamer would have been astern of the range of the red light when a little less than half a mile distant from it, provided the steamer at collision did not point at all towards the stern of the brigantine.

I find that in order to sustain the claimant's contention that a stern light should have been exhibited by the brigantine, each of the following points must be established: (a) That the steamer's lights were visible at least half a nautical mile distant, since at a less distance, even on defendant's hypothesis, they would not be seen astern of the range of the brigantine's red light, and hence no duty to display a stern light would arise; (b) that the wind was W.; and (c) that the brigantine in so light a wind as then prevailed would head within 5 points of it, so that her actual heading should not be south of S. W. by S.; and (d) that at collision the steamer was not pointing towards the brigantine's stern, but was either at right angles to the brigantine or pointing somewhat towards her stem. A substantial variation from either of the above requirements would vitiate the defendant's hypothesis.

(a) Upon a fair consideration of the evidence, I do not think it can be held that either one of the above conditions is satisfactorily proved. The one most nearly established is probably that the steamer's lights could be seen half a mile; yet this is sustained only by two of the seamen at the bow of the brigantine, who estimated the distance at 800 or 1,000 yards, while the mate estimates the distance as only 500 yards. It is obvious that not much reliance can be placed upon estimates either of the distance, or the time that elapsed until collision, where they are not corroborated by other circumstances.

(b) The precise direction of the wind cannot be determined. The weight of evidence of the brigantine's witnesses is clearly that the wind was somewhat south of W.; while the master, second officer and lookout of the steamer all say that the wind came from the port side of the steamer, which would make it considerably S. of W., the master and second officer saying that it was S. W., which however must be erroneous.

(c) The brigantine's experts say that in a very light wind she would not sail within 5 points of it, but from 5½ to 6 points off. The defendant's experts base their contrary testimony upon the assumption that the yards would be more sharply braced in a very light wind; but there is no evidence that the yards were so sharply braced in this case.

(d) The weight of evidence, as above stated, is that at collision the steamer was heading, at least, 2 points towards the stern of the brigantine. This appears from the testimony and diagrams of the master, second officer, quarter-master and carpenter. With that angle of collision, even had the brigantine been heading S. W. by S., the steamer would have been within the range of the brigantine's red light for considerably above the distance of half a mile before collision, as the backward tracing of her course will show.

Three, at least, of the data necessary in order to sustain the defendant's contention, seem, therefore, to be disproved; and I may add that the angle of collision directed two points towards the brigantine's stern is in another respect incompatible with the defendant's hypothesis that the brigantine was heading S. W. by S.; that upon that heading of the brigantine, the steamer, in order to head 2 points towards the brigantine's stern at collision, must have swung about 6 points from her previous course, and this is about 2 points in excess of what her testimony supports. The fair deduction from the steamer's evidence on this head is, that she swung about 4 points to starboard; and this would give the brigantine's heading as S. by W., if the steamer at collision was heading 2 points aft of abeam.

It should be observed also, that while mere estimates of time and distance may be very erroneous, seamen are able to judge approximately of the bearing of the lights seen from the deck; and the united testimony of all on board the brigantine that the steamer's lights from the first were seen about abeam, should receive fair credence in the absence of any impeaching circumstances. If the lights were seen in fact more than 2 points aft of abeam, they would naturally speak of them as on the quarter, or coming up aft, rather than about abeam. In this case the fact that at the time when their testimony was given no issue had been raised on this subject, makes their testimony less liable to the suspicion of misrepresentation or bias on this point. My own judgment is that the steamer's lights were probably not seen more than about 600 yards distant; and if the curve of the steamer's course in swinging 4 points to starboard while traversing about 1,100 or 1,200 feet, the distance she would naturally travel in making that change, be carried back from the point of collision and from a heading of 2 points aft of the brigantine's beam, and thence further backwards straight on her previous course of W. ⅞ S., it will be seen that the lights she would exhibit to the brigantine would not vary half a point from abeam while traversing that 600 yards prior to collision. The consistency of the brigantine's account of the bearing of the lights with the alleged heading of S. by W. and with the angle of collision as established by the steamer's witnesses, and especially with the maneuvering power and previous maneuvers of the steamer, which they could not possibly have understood or foreseen, is very persuasive of its truth in this regard.

I am constrained, therefore, to find the Cheruskia alone to blame for the collision and that the libelants are entitled to a decree with costs.