## THE WILLIAM F. HUMPHREY.

## THE POTTER.

## TIDE WATER ASSOCIATED OIL CO. v. UNITED STATES OF AMERICA.

## UNITED STATES v. TIDE WATER ASSOCIATED OIL CO.

### Nos. 15478, 15538.

District Court, E. D. New York.
Jan. 18, 1939.

Emery & Pyne, of New York City (Warner Pyne and V. A. Catoggio, Jr., both of New York City, of counsel), for libelant.

Michael F. Walsh, U. S. Atty., of Brooklyn, N. Y. (Charles J. Carroll, Sp. Asst. to U. S. Atty., of Brooklyn, N. Y., of counsel), for the United States.

GALSTON, District Judge.

This is a fog collision case. The steamer William F. Humphrey left Houston, Texas, on June 15, 1938, bound for New York. The Humphrey is an oil tanker and was fully loaded with a cargo of crude oil. The Potter left New York at 12:43 noon, eastern daylight saving time, on June 22, 1938, bound for Australia via the Panama Canal. Both vessels encountered fog. The Humphrey at about 7 A. M., eastern standard time, and except for an interval of approximately 40 minutes in the early afternoon, when the fog cleared had to proceed through the fog throughout the entire day; the Potter encountered fog from 4 P. M. Despite soundings of fog signals by both vessels, four minutes after the vessels heard each other's first fog signal, they came into collision. While there

is some discrepancy as to the exact place of collision, it suffices to say that it was off the Jersey coast some eighteen miles and about twenty miles south of Barnegat. Each vessel claims fault in the other, substantially arising out of alleged violation of the international rules governing navigation in fog. The article reads:

"Every vessel shall, in a fog, mist, falling snow, or heavy rain storms, go at moderate speed, having careful regard to the existing circumstances and conditions.

"A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over."

The Humphrey, on encountering fog early in the morning of the day of the collision, proceeded on half speed, a speed which she maintained throughout the day, except for a period of 39 minutes in the early afternoon when the fog cleared, or at slow speed when she was passing other vessels. Automatic fog signals at one minute intervals were sounded by her throughout the whole period. The first signal from the Potter was heard at 7:11 P. M., coming from one to two points on the Humphrey's port bow. The Humphrey's engines were then stopped, and reversed full astern until 7:12 P. M., when her headway had been checked and she was dead in the water. The testimony of her master was that such headway could be checked within one minute when proceeding at half speed. While there was some close cross-examination to determine what half speed meant, the proof shows that her full speed when loaded was ten knots at 64 revolutions of her engine and that at half speed she made 4½ to 5 knots at from 40 to 46 revolutions. Both of these speeds relate to passage through the water, not over ground. Having killed her headway at 7:12, the Humphrey's engines were again stopped and she sounded two blasts to indicate that she was standing. A second signal from the Potter was heard. The master thought one blast was given while the mate thought it was two, but apparently the doubt did not affect the navigation of the Humphrey nor did it in any way contribute to the collision. At 7:12 the Humphrey heard a three blast backing signal from the Potter. It may be observed that at 7:11 the Humphrey, on stopping and then reversing her engine, had also sounded a three blast signal. Presently, according to those on the Humphrey, the Potter was sighted four points on the Humphrey's port bow. When the Humphrey first sighted the Potter, the Potter was 300 to 400 feet distant. Orders were given on the Humphrey's bridge for slow ahead and hard right rudder, but before these orders could be executed the Potter having become visible not only to the lookout but to those on the Humphrey's bridge, the Humphrey's helm was ordered amidships and her engines full astern at 7:14. The vessels struck at 7:15 according to the time on the Humphrey's clock. The first contact was on the Humphrey's port side, abreast the bridge, and the second substantial contact 50 feet forward of the stern. There was intermediate scraping along the port side of the Humphrey, damage to her lifeboat davits, and her bridge and forward house were also badly shattered in addition to damage to her side plates.

The photographs of the Potter's stem show that it was twisted to starboard. The Potter had left New York at 12:43 noon, eastern daylight saving time; passed Scotland Light vessel at 3:07 P. M. and continued on her way except for a one minute interval at 7:32 P. M., at a speed of 10.6 knots, making 92 revolutions of her engines. The ship was three-quarters loaded and had a dead weight in her of 5800 tons. The displacement of the vessel light is approximately 4000 tons. The ship was provided with both a magnetic compass and a gyro compass.

The vessel had stopped at 7:32 on hearing a signal from another ship, but heard no other signals from vessels until the first whistle from the Humphrey at 8:09. At 8:09 the Potter was making approximately 10 knots, having averaged on the 4 to 8 watch 92.3 revolutions. Sanders placed the sound of the Humphrey's first signal two points on his starboard bow. At 8:10 he thought the whistle was closing in, probably a point on the starboard bow.

On hearing the first whistle from the Humphrey Sanders ordered the engines stopped. He testified that at 8:10 P. M. he ordered full speed astern on hearing the second whistle from the Humphrey; but the engine room bell and log books show that the movement of her engines for full astern was not received until 8:11. At 8:12, full astern, this time with extra jingle, was ordered.

Was there a violation by either vessel of the rule with respect to navigation in

fog? The case against the Potter must be approached with a view of determining whether her speed in the fog was moderate, having careful regard to the existing circumstances and conditions. Her speed up to 8:09 P. M. was approximately 10.6 knots. Such speed had been maintained despite the fog into which she rode at 4 P. M. Indeed, it appears that before meeting the fog her speed was no greater. Sanders had testified that at 7:33 he went ahead at 92 revolutions. The Potter is a motor ship and Sanders said it takes 24 hours to heat up the engines. He had testified before the steamboat inspectors that the normal full speed of his vessel was 12 knots, corresponding to 98 or 100 revolutions. He also said before the inspectors that his average speed from the Scotland Light until the time of the collision was 10.39 knots. It was thus apparent that though he was navigating in the fog at that time—they had not seen Barnegat Light vessel because of the fog—there had been no considerable reduction from the normal full speed of 12 knots.

■ The authorities hold that that is not a sufficient reduction. The Saale, 2 Cir., 63 F. 478; The Cheruskia, D. C., 92 F. 683; The Lepanto, D. C., 21 F. 651; The City of Atlanta, D. C., 26 F. 456. Sanders admitted that it would take three and a half minutes from full speed ahead to full speed astern to take the way off the Potter.

■ One of the considerations which must be had in mind to determine what, with a view to surrounding facts, was a moderate speed, is the question of visibility. Here there is sharp conflict. Those on the Potter claim that the visibility extended 1000 feet, whereas those on the Humphrey admit only 600 feet. Could the Potter have cut off all headway proceeding at the speed of 10.6 knots within 1000 feet? The fact is she didn't, for those on the Humphrey at the time of collision testified to her bow wash, and other circumstances to which reference will be made to indicate that her headway had not been lost at the moment of collision.

■ In The Lepanto, D. C., 21 F. 651, Judge Brown said [page 659]: "and no steamer's speed can be held 'moderate' that does not admit of her coming to a full stop within her share of the distance that separates her from another, after the latter's whistle is audible." In The Cheruskia, D. C., 92 F. 683, Judge Brown considered a reduced speed of 9½ knots in a fog as compared with 11 knots full speed, and held that that still left excessive speed. This well recognized authority held that in moderate fog the reduction should have been at least to ⅔ of full speed. Applying such a calculation to the admitted full speed of the Potter, not her maximum speed but her usual full speed, a moderate speed would have been 8 knots and it is quite possible that had that speed been followed the collision would not have resulted. See, also, New York & Cuba Mail S. S. Co. v. U. S., 2 Cir., 16 F.2d 945.

Nor is the Potter free from that provision of the rule which requires the steam vessel on hearing forward of her beam the fog signal of another vessel, the position of which is not ascertained, to stop her engines and to navigate with caution until the danger of collision is over. For while the Potter apparently ordered a stop signal on hearing the first fog signal from the Humphrey, her engines were not ordered reversed until 8:11. There is some dispute about this time. The master said that he ordered the engines reversed at 8:10, but the engine room bell book and the engine room log book show that the engines were reversed at 8:11, two minutes after the Humphrey was first heard and likewise only two minutes before the collision. The deck log of the Potter showed that a full speed astern signal was given at 8:10, but there is what appears to be an obscurity in the pencil mark which looks as though the zero were written over the integer "1". Midgett, the second officer of the Potter, examined this entry and said that the hand writing was that of Clark, the fourth officer. He said at first that he could see nothing except 8:10, though he admitted that there appears to be a very little or small mark within the zero. My own examination of the exhibit with the aid of a magnifying glass enables me to see what apparently is the figure "1" circumscribed by the zero. As part of the entry made at that time, the deck log book reads "full astern *danger signal* sounded, whistle of other vessel appeared more ahead." But Captain Sanders testified that the *danger signal* was not given until after the Humphrey was actually sighted and that could not have been at 8:10; at least the deck log entry does not so show it.

Since the speed of the Potter was considerable, it would seem that the stop order should have been accompanied by a reversal signal at 8:09 and certainly before

8:11. See The Lepanto, D. C., 21 F. 651; The City of Atlanta, D. C., 26 F. 456.

The reading of the course recorder by Whittaker, of the Sperry Gyroscope Company, does not help the Potter's position. A reversal of the Potter's engines threw her bow to starboard, as her master testified. On the course recorder at 8:07 the heading of the Potter was 179½, which indicated to Mr. Whittaker that the vessel had been maintaining a course or heading with considerable uniformity. At 8:07 there was a slight change to port, bringing the vessel to a heading of 178 at 8:08. That slow swing continued so that at 8:09 the heading was 177. The swing to port continued and brought the vessel to a heading of 164 at 8:11. Then at 8:11 and 18 seconds the vessel's heading was suddenly changed to a starboard swing, bringing it to a heading of 189 at 8:12, and that starboard swing continued all the way to 327 at 8:19.[1] The course recorder as interpreted by Whittaker shows that the first interruption of the ship's heading to port by starboard movement was at 8:11 and 18 seconds, and that such deviation might indicate when the collision or contact took place. Had there been a reversal of engines, as the master of the Potter contended at 8:10 (ship's clock) the swing to starboard which would have been caused thereby should have been shown on the course recorder, and the course recorder clock time at 8:07; but as Mr. Whittaker said: "Following 8:07 there was a slight change to port, bringing the ship to a heading of 178 at 8:08."

I must conclude, therefore, that the Potter was at fault both in the speed which was maintained in the fog and in her failure to reverse her engines in the circumstances outlined hereinbefore.

On the other hand, I find no attributable fault to the Humphrey. From the time that she encountered fog early in the morning of June 22, she reduced her speed so that she was proceeding, with the exception of the 39 minute interval, either at half speed or at slow speed between 4:30 P. M. and 6 P. M., during which time she was passing other vessels. From 6:30 P. M. until she heard the Potter she proceeded at half speed. She was near enough to New York not to accelerate her speed for, as her master testified, even if it had cleared he did not wish to reach New York before daylight the next day. Her full speed was 10 knots, so that at half speed she had certainly complied with the indicated reduction suggested by Judge Brown in the cases of The Cheruskia, The Lepanto and The City of Atlanta, supra. Thus she had proceeded in full compliance with the fog rule requiring her to proceed at a moderate speed, having regard to the existing circumstances. Moreover, her engine room log book shows three signals on the telegraph, all at 7:11 P. M.—slow, stop and full astern. The engines were again stopped at 7:12, at which time she was dead in the water. Significant is the testimony given by Captain Sanders before the steamboat inspector. He was asked, concerning the Humphrey:

"When you first observed him a ship's length or whatever it was away, did he have any headway on her? A. No, I couldn't say he had much. He had some headway—there is no question about that—but not much."

Such was also the testimony of Clark, the fourth officer. He testified:

"Did you notice whether your vessel had headway on at the time of the first contact? A. Very little; we were practically stopped.

"Did you notice whether the other vessel had headway on? A. She had some, yes sir; not very much."

I think that if the Humphrey had had headway the testimony on the point by the officers of the Potter would have been offered with more conviction.

Finally it must be observed that the damage to the Potter (the photograph shows her bow bent to starboard) is inconsistent with the contention that the Humphrey's headway pushed the Potter's bow to port.

The Tide Water may have a decree and the libel of the Government will be dismissed.

If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, submit findings of fact and conclusions of law in accordance therewith.

---

[1] It was testified to by officer Gald of the Potter that a comparison of the pilot house clock and the gyroscope clock made by him after the collision showed that the recorder was 3 minutes slower than the pilot house clock, although at 9:30 a. m., on June 22, the clocks were alike.