(80 App. Div. 415.)

## PEOPLE v. PIERSON.

(Supreme Court, Appellate Division, Second Department. March 26, 1903.)

1. OMITTING TO PROVIDE MEDICAL AID FOR A CHILD—INDICTMENT—SUFFICIENCY.
   An indictment under Pen. Code, § 288. punishing the failure to furnish medical attendance for a minor child, which alleges that defendant did omit to perform the duty imposed on him by law to furnish medical attendance for his child, the said child then and there being ill from catarrhal pneumonia, and he, the said defendant, then and there refusing "to allow said minor to be attended and prescribed for by a" qualified physician, is defective, for failing to aver facts showing that the case required a physician.

2. SAME—WHAT CONSTITUTES OFFENSE.
   The question whether a father who fails to provide his sick child with a licensed physician is guilty under Pen. Code, § 288, punishing the failure to furnish medical attendance for a minor child. depends on whether an ordinarily prudent person, anxious to promote the recovery of his child, would call in a physician.

3. SAME—INSTRUCTIONS.
   An instruction that, before the jury could convict, they must find that defendant knew that the child was ill, and intentionally failed or refused to call in a physician, or to give to it such medicines "as the science of the age would say would be proper," was erroneous, for failing to apply the standard of conduct of an ordinarily prudent person, though it imported that defendant might give proper medicines, even if he did not call in a doctor.

4. SAME—OBJECTIONS TO INDICTMENT—HOW RAISED.
   The objection that an indictment does not charge a criminal offense may be taken under a plea of not guilty, or may be raised, under the express provision of Code Cr. Proc. § 331, by demurrer or by arrest of judgment.

5. SAME—REVIEW ON APPEAL—REVERSAL IN ABSENCE OF EXCEPTIONS.
   Where a criminal case has been submitted to a jury on an indictment which does not charge a crime, and on an erroneous theory of the law, the appellate court may, under the express provisions of Code Cr. Proc. § 527, reverse the case, even in the absence of exceptions.
   Goodrich, P. J., dissenting.

Appeal from Westchester County Court.

J. Luther Pierson was convicted for omitting to furnish medical attendance for his minor child, and appeals. Reversed.

Argued before GOODRICH, P. J., and BARTLETT, JENKS, WOODWARD, HIRSCHBERG, and HOOKER, JJ.

Robert E. Farley, for appellant.

J. Addison Young, for the People.

WILLARD BARTLETT, J. It seems to me quite clear that this judgment should not be allowed to stand. While granting the existence of a legal obligation on the part of a parent, or one standing in loco parentis, to provide medical attendance for a minor child, it seems to me that the obligation does not necessarily import in every case the calling in of a physician. The indictment in the case at bar, however, is framed upon the assumption that the law requires the parent of a sick child to cause the child to be attended and prescribed for by a regularly licensed and practicing physician and surgeon. The indictment charges that the defendant, J. Luther Pierson—

"Did willfully, maliciously, and unlawfully omit, without lawful excuse, to perform a duty imposed upon him by law, to furnish medical attendance for his said (J. Luther Pierson's) female minor child, under the age of two years, the said minor being then and there ill and suffering from catarrhal pneumonia, and he, the said J. Luther Pierson, then and there willfully, maliciously, and unlawfully neglecting and refusing to allow said minor to be attended and prescribed for by a regularly licensed and practicing physician and surgeon, contrary to the form of the statute in such case made and provided."

It may be suggested that the first part of the language quoted sufficiently charges the crime, and that the subsequent specification in regard to the defendant's neglect and refusal to allow the child to be attended and prescribed for by a regularly licensed and practicing physician and surgeon may be disregarded, as surplusage. It seems to me, however, that this construction is contrary to the plain meaning of the pleader, and that the intention was to charge that the crime consisted not merely of a failure to furnish medical attendance generally, but a failure to furnish medical attendance by a qualified doctor.

If this view of the indictment is correct, it seems to me that it failed to charge a criminal offense, in the absence of an allegation or statement of facts showing that the case was one in which a regularly licensed and practicing physician and surgeon ought to have been called. The question as to whether such a state of facts existed must be determined, I think, by the standard of conduct of an ordinarily prudent person. In other words, I think the medical attendance which the law requires the parent to provide for his child depends upon the circumstances of the case; that in some instances ordinary household nursing by the members of the family may be sufficient; that, if the illness is of a graver character, it may be enough to call in the services of a trained nurse, and, when danger is apparent, then the obligation, under the law, goes so far as to require that a physician be summoned. But the guide to proper conduct must be ascertained by asking, "What would an ordinarily prudent person, solicitous for the welfare of his child, and anxious to promote the recovery of the patient, do under the given circumstances of the particular case?" The defendant was not tried upon any such view of the law as this. The learned trial judge told the jury that before they could convict the defendant they must find "that he knew that the

child was ill, and deliberately and intentionally failed or refused to call in a physician, or to give to it such medicines as the science of the age would say would be proper that a child in its condition should have." It is true that this portion of the charge presented alternatives, and imported that the defendant might comply with his obligations under the law by giving proper medicines, even if he did not call in a doctor; but I think it was going too far to imply, as does the language quoted, that he would necessarily fail to discharge his duty if the medicines he gave were not such as the science of the age would say were proper. As I have already intimated, I think the standard which should be applied is the conduct of an ordinarily prudent person.

If I am right in my construction of the indictment, in holding that the fair import of the language used therein is to restrict the charge to a failure to allow the child to be treated by a regularly licensed physician and surgeon, and if I am also right in thinking that the medical attendance prescribed by the law does not, under all circumstances, require a physician to be summoned, it follows that the facts stated in the indictment do not constitute a crime. This objection may be taken under the plea of not guilty, as well as by demurrer (Code Cr. Proc. § 331), and also in arrest of judgment. It is true that no motion in arrest of judgment appears in the record, and that no exception was taken to the language which I have quoted from the charge; but where it appears that a criminal case has been submitted to a jury upon an indictment which does not charge a crime, and upon an erroneous theory of the law applicable to the subject-matter, the appellate court possesses the power to reverse, even in the absence of exceptions. Code Cr. Proc. § 527.

Judgment of conviction reversed, and new trial ordered.

HIRSCHBERG and JENKS, JJ., concur. WOODWARD, J., not voting.

GOODRICH, P. J. I dissent. There was no objection in the nature of a demurrer taken at the trial, as might have been done under section 331 of the Code of Criminal Procedure, that "the facts stated [in the indictment] do not constitute a crime," according to section 323. It is true that under section 527 the Appellate Division may order a new trial, if satisfied that the verdict is against the weight of evidence or against law, or that justice requires it, whether an exception was taken, or not, in the court below. But I am not convinced that any of the three contingencies referred to in section 527 has arisen.

If there was error in the portion of the charge referred to in the prevailing opinion, which I have not been able to discover, a collocation of that with subsequent portions of the charge will show that there was no possible injustice to the defendant:

"You must find, before you convict this defendant, that he did this thing willfully; that is, that he knew that the child was ill, and deliberately and intentionally failed or refused to call in a physician, or to give to it such medicines as the science of the age would say would be proper that a child

in its condition should have. * * * The question for you to determine is, did he know the child's condition, and did he willfully refuse or fail to provide the child with medical attendance, or with such remedies as the ordinary man would say would have been likely to alleviate the suffering or to prolong the life of the child."

If the defendant had excepted to the first proposition, and the court had denied that the use of the words "science of the age" was not strictly in accordance with the law, or unjust to the defendant, doubtless further emphasis would have been put upon the second proposition; and while there is no doubt of our power to grant a new trial, with or without exception taken below, I am strongly of opinion that justice does not require the granting of a new trial.

The indictment accused the defendant of the crime of willfully, maliciously, and unlawfully violating the provisions of subdivision 1 of section 288 of the Penal Code, and charged that on the 15th day of February, 1901, he—

"Did willfully, maliciously, and unlawfully omit, without lawful excuse, to perform a duty imposed upon him by law, to furnish medical attendance for his said (J. Luther Pierson's) female minor child, under the age of two years, the said minor being then and there ill and suffering from catarrhal pneumonia, and he, the said Luther Pierson, then and there willfully, maliciously, and unlawfully neglecting and refusing to allow said minor to be attended and prescribed for by a regularly licensed and practicing physician and surgeon, contrary to the form of the statute in such case made and provided."

Section 288 reads, in part, as follows:

"Sec. 288. Unlawfully Omitting to Provide for Child. A person who (1) wilfully omits, without lawful excuse, to perform a duty by law imposed upon him to furnish food, clothing, shelter or medical attendance to a minor * * * or (4) neglects, refuses or omits to comply with any provision of this section * * * is guilty of a misdemeanor."

The "duty by law imposed" is found in section 289, which reads, in part, as follows:

"A person who (1) wilfully causes or permits the life * * * of any child actually or apparently under the age of sixteen years to be endangered, or its health to be injured, * * * is guilty of a misdemeanor."

Evidence was introduced by the people to show that the child was "somewhere near two years of age." The coroner who held the inquisition was a physician, and testified that he was told by the defendant—

"That the child had died without medical attendance. I asked him if he was too poor to afford a physician and he said 'No'; that he had ample means to employ one, but that he didn't believe in them. I asked him what the trouble was, and he said it suffered first from whooping cough, and then he thought it developed into pneumonia. That was a casual inquiry, and then I ordered two physicians to make an autopsy—Dr. Birch, an ex-coroner, and Dr. Kelly, of White Plains. While they were making the autopsy I made the inquisition, and the defendant made the following statements: That he had ample means to employ a physician, but that his religious belief would not permit him to do so. I asked him if it was Christian Science, and he said 'No.' I asked him what creed it was, and he said he belonged to the Christian Catholic Church of Chicago, and it permitted no physician at sickness; that they healed by prayer; that they believed in disease, but did not believe in any medicine, and believed that faith and prayer would cure disease. The autopsy revealed that the child had bronchial pneumonia, and died as a consequence. The history of the case was given that the child had had whooping cough, which

developed into bronchial pneumonia. I asked him how he accounted for the child's death, and he said it must have been because of a lack of faith—did not have faith enough. The child had died some time the previous day—in the afternoon on the 14th of February, as near as I can remember. To the Court: The child died of bronchial pneumonia or catarrhal pneumonia. Both are the same. To Mr. Andrews: The child was pretty well emaciated, and showed considerable suffering. Cross-examination by Mr. Haines: * * * The defendant gave as his reason for not calling a doctor that he did not believe in them, and that he thought prayer was as effective as medical attendance, and that he believed in the existence of disease, the same as he did in the existence of life, and that where disease was permanently located that medical attendance would not aid it if prayer would not. It was his idea that disease was as active as life was. * * * Whooping cough is not necessarily a dangerous disease. It is curable and cures itself in nine cases out of ten. Pneumonia is also curable."

Dr. Birch, a physician who made the autopsy of the body of the child at the inquisition, substantially corroborated the testimony of the coroner. He also testified:

"He said in giving it nourishment he had given it milk; did not believe in medicine, and gave it no medicine. I do not recollect that he said anything besides milk. He said that he had no physician attending; that he attended to it himself—he and his wife. He said he did not believe in physicians, and that his religious faith led him to believe that the child would get well through prayer, and the reason the child died was because his faith in prayer was not strong enough. He said he did not believe in physicians; he did believe in disease, but he believed that his religion was a way to cure disease. He did not believe in physicians, he said."

At the close of the people's evidence the defendant's counsel moved to dismiss the indictment on the ground—

"That this defendant has been exercising only his constitutional right to obey the dictates of his honest religious convictions, guarantied to him under section 3, art. 1, of the Constitution, and cannot be held willfully criminal to have violated any statute of the state in so doing."

The court denied the motion, and the defendant excepted.

The defendant was called as a witness on his own behalf, and testified, in part, as follows:

"The child was taken sick while at my house. She was sixteen and a half months old when she died. She had been with us. when she was 36 hours old, and we had taken care of her down to the time of her death. She was taken with whooping cough some time in January. I had forgotten just when. I think it was 36, and maybe 48, hours—between 36 and 48 hours—before she died that she was taken worse. During that time we were both with her night and day. She died at 12:15 a. m. on the 23d; that is, 12 o'clock at night. I sent no word to any·one in, reference to her sickness, except in the case of one or two friends that I asked if they would join with us in prayer for her. When I observed that she was worse, I asked them to join with me in prayer. * * * At a rough guess, I should say it was about 48 hours before she died that I observed that her symptoms were of a dangerous character. I had forgotten that, but I think about 48 hours. My particular creed or faith is that we believe in the infallibility of the instructions of the Holy Scriptures, and we take them as a rule of sufficiency for daily life and practice. Q. What is your belief as to the efficacy of prayer in regard to healing disease and curing the sick? A. We base our belief and take our belief from the 5th chapter of James, 'and the prayer of faith shall save the sick and the Lord shall raise him up.' Relying upon that, we exerted ourselves in that way for the protection of this child. We did this when we observed her symptoms were of a serious character, and at that time I believed that what we did was the best thing to do for the child.

And I exerted myself in this way in prayer with her. I do not believe that it takes any great crying out to God to bring his promises. So far as I went, it was the best I could do. And during that time we believed that our prayers would be answered, and that the child would be saved. We believed further that if we called a physician it might tend to the destruction of the child, and believed that, if we called a physician, instead of the child being saved, it would surely die. To avoid its death, we adopted the mode and prayer of our creed and our belief, and exerted ourselves for the child's protection and safety. * * * The only reason that I can see why the child died is that there must have been some lacking in my own self— some insufficiency standing before God. * * * To the Court: I did not send for a physician because I believe that in prayer and by faith God will save the sick. I believed that my prayer would cure the child, and I cannot answer why it did not. That is one of the unexplainable things. I did not know that it was a proper thing to do to send for a physician. I have been a believer in Divine Healing for probably about five years. Before that I believed in the use of medicine and use of medical skill, and anything that was advised by science in relation to the health of the body. I used homeopathic physicians at one time, and allopathic the next. No; I did not believe that the child was dying. I believed that God would raise her up almost to the last moment, and then, like a great many other fathers when seeing the dear one torn away from them, I weakened as I felt the little one slip away from my grasp, and it broke my heart. Q. When you found that the child was dying, did you realize that your prayers were not answered, and did you not realize that it was proper to send for a physician? A. No, sir; I did not realize that I should send for a physician. Q. Had you known that the child was dying, and that your prayers were not to be of any use in saving the child, would you then have sent for a physician? A. I would not like to admit that; possibly. My prayers should have been the means of saving that child. His promises are there, and, no matter how much I fail in my walks, His promises are there yet. I believe in the healing of the sick by prayer. I believe in salvation first, and in healing next. I mean salvation of the soul and spirit through the atoning blood of Jesus Christ. All men believe in that. You can search the Bible, and you cannot find any authority for the use of medicine or physicians in any form. I would not use a doctor or medicine, because there is no paragraph in the Bible especially directing that I shall, and many directing that I shall not. One directing that I shall not is in James v, 14. You will find there: 'If any are sick among you let him call for the elders of the church and let them pray over him.' I did not call for the elders of the church. There were no elders I could call for. I would have called in the elders of the church willingly if there had been any to call on. I think the Almighty would arrest disease if I asked him. I do not think he had some special interest in punishing the child through me. * * * Q. Is there anything in your religion that teaches you to disobey the law of the land? A. I do not admit that the law of the land enters into it. It is a matter of conscience. I do not set myself above the law, and I do not admit the right of the law to put any medicine in a child of mine. I admit that the lawmaking power may say that I cannot starve my child to death, and I believe that the law has a perfect right to say that the child shall be properly fed. I stop there, so far as the administration of medicine is concerned. I stop at medicine, and not at clothing and food, because God Almighty provides a way of healing for children who believe in Him."

The court charged the jury that before they could convict the defendant they must find that his failure to provide medical care and attendance must have been willful—

"That is, that he knew that the child was ill, and deliberately and intentionally failed or refused to call a physician, or to give to it such medicine as the science of the age would say would be proper that a child in its condition should have."

The court also charged as follows:

"He [the defendant] is at perfect liberty, under our law, to believe in any form of religion he chooses to believe in, but he is not at liberty to exercise any religious or other belief when the result of that belief is to cause the death of anybody dependent upon him, or anybody whom he is bound to provide for; and if the outcome of that belief was the death of this child, and you so find, you will convict this defendant, notwithstanding he believed that he ought not to call in a physician or apply any remedies."

The jury found the defendant guilty, with a recommendation of mercy, and he was sentenced to pay a fine of $500, or to serve a day in jail for each $1 of the fine. From that judgment the defendant appeals.

The importance of the questions presented on this appeal is apparent from the fact, shown by recent statistics, that about 150,000 people in the United States, under various names, profess to believe in Divine Healing; that is, in the efficacy of prayer for the healing of the sick, without medical attendance or medicines. The creed of the defendant is shown by his own testimony:

"My particular creed or faith is that we believe in the infallibility of the Holy Scriptures. * * * We base our belief and take our belief from the fifth chapter of James, 'and the prayer of faith shall save the sick and the Lord shall raise him up.' I believe in the healing of the sick by prayer. * * * You can search the Bible, and you cannot find any authority for the use of medicine or physicians in any form. * * * I do not admit that the law of the land enters into it. It is a matter of conscience. * * * I stop at medicine, and not at clothing and food, because God Almighty provides a way of healing for children who believe in Him."

The underlying question is whether or not such a profession of religious belief justifies the defendant in his refusal to obey the statutory law of this state.

The grounds of the appeal, succinctly stated in their sequential order, are as follows: (1) Section 288 does not, in terms, declare it to be the duty of any one to furnish medical attendance to a minor. (2) The statute, being penal, must be strictly construed in favor of the accused. (3) There is no common-law duty to furnish medical attendance to a minor. (4) Medicine and medical attendance are not necessities, under the law. (5) Any law compelling a person to furnish medicines or medical attendance to one's infant child is unconstitutional. (6) There was nothing in the child's illness to render necessary medicine or medical attendance. (7) The defendant did not willfully omit to furnish medical attendance, and had no evil intent, and unless he had an evil intent he is not guilty of the crime charged. (8) The people were bound, but failed, to prove that medical attendance would have been beneficial to the child. (9) The offense as charged in the indictment has not been proved. (10) Errors are predicated of portions of the charge. I shall take up these questions in their order, grouping them where they are cognate propositions.

As to the first, second, and third grounds: While section 288 of the Penal Code does not, in terms, declare it to be the duty of any one to furnish medical attendance to a minor, it provides that a person who willfully omits to perform a duty by law imposed upon him to furnish medical attendance to a minor is guilty of a misdemeanor. It may be conceded that at common law the duty of furnishing medical attendance to a minor child was not imposed upon a parent; but sec-

tions 288 and 289, taken together, impose such a duty, by declaring that a person is guilty of a misdemeanor who willfully omits, without lawful excuse, to perform a duty by law imposed on him, to furnish medical attendance to a minor, and willfully causes or permits the life of any child under 16 years of age to be endangered, or its health to be injured. It is true that the statute, being penal, must be strictly construed in favor of the accused; but that is not to say that we may disregard the plain and express provisions of the law embodied in the two sections, which make it a misdemeanor willfully to endanger the life or health of a minor child by failing to provide medical attendance when it is necessary. The point is not raised that the child was only an adopted child, nor could it well be raised. In Cowley v. People, 83 N. Y. 465, 38 Am. Rep. 464, it was held that where a person took a child, not his own, into his care and custody, his duty to provide necessary food and medical attendance was more imperative than it would be in the case of his own children, inasmuch as the duty in the former case was voluntarily assumed. The defendant admittedly stood in loco parentis to the child, who was in his custody. That fact, under sections 288 and 289, imposed upon him the duty of not willfully omitting, without lawful excuse, to furnish medical attendance to the child in case of necessity, and thereby willfully cause or permit the life of the child to be endangered, or its health injured.

Under the fourth ground, that medicines and medical attendance are not necessities under the law, the learned and diligent counsel of the defendant has cited, not without a sense of humor, the opinions of physicians of one school of practice as to the other schools, of physicians of the same school as to each other, and of laymen as to both, and as to the inadequacy or insufficiency of the various schools of medicine, or, indeed, of all the schools taken together, or of drugs, to insure health to the sick, in order to show how a person may wander blindly in the mazes of diverse systems of therapeutics, without ability to select that system or that medical attendance which is a necessity in special cases of sickness. All of this is outside of the question involved. Here there was no question of selection or attempt at selection by the defendant, for his refusal to call medical attendance was intentional, deliberate, and willful. He testified that he sent no word to any one, because he believed the child would surely die if he called any physician; that it was a part of his religious belief that no physician should be called, and that prayer alone should be relied upon for the healing of disease. This involved no question of selection of medicines or medical attendance, or of choosing between differing practitioners. His method was not—what all Christian creeds recognize—the exercise of prayer in connection with the use of remedies and scientific treatment. It was a substitution of prayer for medical attendance, not selection of men or measures. In other words, it was a plain refusal to obey the law which enjoined the furnishing of medical attendance to a sick child, and that without lawful excuse.

The Legislature, in the public health law (1 Rev. St. [9th Ed.] p. 837 et seq.), has recognized three great schools of medicine, and provided for boards of examiners from each to examine candidates for admission to the practice of medicine, and the licensing of such as are

found to be competent. The object of the law is to protect the lives and health of the people against the practice of medicine by ignorant and unskilled persons. That is the settled policy of the state. To compel the furnishing of medical attendance to sick children is but the carrying out of this policy, and such a law is clearly within the police power of the state.

We are thus brought to the appellant's fifth contention, which is the really important question before us, viz., the constitutionality of the sections of the Penal Code above cited. We must not lose sight of the fact that this statute does not trench upon the right of an adult to refuse medical attendance for himself, whether it is refused as matter of conscience or expediency. That there may be no misapprehension as to the scope of the constitutional provision of this state, I cite it in full (article 1, § 3):

"The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all mankind; and no person shall be rendered incompetent to be a witness on account of his opinions on matters of religious belief; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this state."

The exception at the close is significant. It is suggestive of the conclusion of the Roman Twelve Tables, "Salus populi suprema lex." Liberty of conscience shall not justify practices inconsistent with the peace and safety of the state. The peace and safety of the state involve the protection of the lives and health of all its citizens. Such lives and health have public value—slight, perhaps, when considered with reference to the individual, but large in the aggregate. The doing of an act or the omitting to do an act, which act or omission endangers the life and health of a citizen, endangers the peace and safety of the state, and cannot be justified under the plea of liberty of conscience. In the exercise of its plenary powers, the Legislature can enact any provision for the protection of the public health which does not interfere with liberty of conscience, or is not forbidden by the Constitution of the United States or that of the state of New York.

In the License Cases, 5 How. 504, 583, 12 L. Ed. 256, Chief Justice Taney said:

"But what are the police powers of a state? They are nothing more or less than the powers of government inherent in every sovereignty to the extent of its dominions. And whether a state passes a quarantine law, or a law to punish offenses or to establish courts of justice, or requiring certain instruments to be recorded, or to regulate commerce within its own limits, in every case it exercises the same power; that is to say, the power of sovereignty—the power to govern men and things within the limits of its dominion. It is by virtue of this power that it legislates, and its authority to make regulations of commerce is as absolute as its power to pass health laws, except in so far as it has been restricted by the Constitution of the United States."

It was said in Barker v. People, 3 Cow. 686, 704, 15 Am. Dec. 322:

"The power of the Legislature in the punishment of crimes is not a special grant, or a limited authority to do any particular thing or to act in any particular manner. It is a part of 'the legislative power of this state,' mentioned in the first sentence of the Constitution. It is the sovereign power of a state to maintain social order by laws for the due punishment of crimes. It is a

power to take life and liberty, and all the rights of both, when the sacrifice is necessary to the peace, order, and safety of the community. This general authority is vested in the Legislature, and, as it is one of the most ample of their powers, its due exercise is among the highest of their duties. When an offender is imprisoned, he is deprived of the exercise of most of the rights of a citizen, and when he suffers death all his rights are extinguished. The Legislature have power to prescribe imprisonment or death as the punishment of any offense. The rights of a citizen are thus subject to the power of the state in the punishment of crimes; and the restrictions of the Constitution upon this, as upon all the general powers of the government, are that no citizen shall be deprived of his rights, unless by the law of the land or the judgment of his peers, and that no person shall be deprived of life, liberty, or property without due process of law."

In Lawton v. Steele, 119 N. Y. 226, 232, 233, 23 N. E. 878, 7 L. R. A. 134, 16 Am. St. Rep. 813, the court said:

"The legislative power of the state, which by the Constitution is vested in the Senate and Assembly (section 1, art. 3), covers every subject which, in the distribution of the powers of government between the legislative, executive, and judicial departments, belongs, by practice or usage, in England or in this country, to the legislative department, except in so far as such power has been withheld or limited by the Constitution itself, and subject, also, to such restrictions upon its exercise as may be found in the Constitution of the United States. From this grant of legislative power springs the right of the Legislature to enact a criminal code, to define what acts shall constitute a criminal offense, what penalties shall be inflicted upon offenders, and generally to enact all laws which the Legislature shall deem expedient for the protection of public and private rights, and the prevention and punishment of public wrongs. The Legislature may not declare that to be a crime which in its nature is and must be, under all circumstances, innocent; nor can it, in defining crimes or in declaring their punishment, take away or impair any inalienable right secured by the Constitution. But it may, acting within these limits, make acts criminal which before were innocent, and ordain punishment in future cases where before none could have been inflicted. This, in its nature, is a legislative power, which by the Constitution of the state is committed to the discretion of the legislative body."

If the peace, order, and safety of the state require it to protect the life and health of adults, as it continually has done in varied legislation, it has a more emphatic duty to protect the lives and health of helpless infants, who have neither sense nor power to protect themselves. God has devolved upon parents the moral duty of caring for their young and helpless children, and this duty includes the doing of everything essential to their welfare in sickness and in health; and this moral duty includes the furnishing of necessary medical attendance to sick children, according to the ability of their parents to provide it. The common law has always recognized and enforced the moral duty of parents to support and care for their infant children. The Legislature, in the sections in question, has not only recognized this duty, but has extended it so as to include the furnishing of medical attendance by parents to their minor children when necessary. I have intentionally, in this and various sentences referring to the statutory duty, used the word "parents," although it is not used in the sections in question. This is manifestly proper, because the use of the words "without lawful excuse" excludes from the operation of section 288 all persons except parents and persons having the care and custody of minors, and necessarily includes them.

I have not been able to find the words "medical attendance" used

in any statute connective with the subject until the adoption of the
Penal Code in 1881 (chapter 676). The previously existing statute,
"An act to prevent and punish wrongs to children" (chapter 122, p. 95,
Laws 1876), contained no such words; and yet in Cowley v. People,
supra, where Cowley was indicted under that act, the court held
that, as he had taken a child into his care, the law imposed upon
him the duty of giving him not only food and clothing, but also
medical attendance, reasonable, necessary, and proper to keep its life
from danger and its health from injury, and that if he did not perform
that duty he was guilty of the crime charged.

The English statute on the subject (31 & 32 Vict. c. 122, § 37)
was passed in 1868. It contained the words "medical aid"; and in
Regina v. Downes, 13 Cox's Cr. Cases, 111, the defendant was in-
dicted for manslaughter, in causing the death of his infant son by
neglecting to provide "medical aid." He was convicted, and the
judgment was affirmed. Chief Justice Coleridge held that, if the
death of a person results from an omission or breach of duty created
by law, the death so caused is the subject of manslaughter; that in
the case before him "there was the deliberate intention not to obey the
law—whether proceeding from a good or bad motive is not material."
It is still more significant that while the English statute just referred
to was amended in 1894 (57 & 58 Vict. c. 41) so as to read, "If any
person  *  *  *  who has the custody, charge or care, of any child
under the age of sixteen years, wilfully  *  *  *  neglects  *  *  *
such child  *  *  *  in a manner likely to cause such child  *  *  *
injury to its health,  *  *  *  that person shall be guilty of a mis-
demeanor," yet in The Queen v. Senior [1899] 1 Q. B. Div. 283, a
person indicted thereunder was convicted, although he belonged to
a sect which objected on religious grounds to calling in medical aid
and to the use of medicine, for the reason that he had willfully and
deliberately abstained from providing medical aid which was neces-
sary for his child, which he knew to be dangerously ill, although in
other respects he had done all he could in the best interests of the
child.

In Regina v. Cook, tried in London in 1898, and reported briefly
in 62 Justice of the Peace, 712, it appeared that the prisoners belonged
to a sect known as the "Peculiar People," and that it was part of
their religion that it is wrong to call in medical aid or to accept
medical assistance. Their daughter died, and it was proved that
they had not called in medical aid, though they had sufficient means
to pay for it. Bingham, J., in charging the jury, said:

"The prisoners are indicted for neglecting a duty the law imposes, whereby
they accelerated the death of their child. If you believe this child's life would
have been prolonged had the prisoners called in medical assistance, your duty
is to find them guilty of manslaughter. You are not to be carried away by
feelings of respect for conscientious objections. I believe, and probably you
do, that they think they are doing right in not calling in medical assistance,
but it is not because people think they are right in breaking the law that
they are to be protected. These two prisoners had the care and custody of the
child. For reasons we have nothing to do with, they chose to neglect to take
those steps which the law says they must take. I tell you they ought to
have called in medical aid, and it was a crime not to do it. If you believe

that they by their act accelerated the death of their child, then they are guilty."

There is a review of the case in 68 Albany Law Journal, at page 232, in which at some previous stage of the proceeding it appeared that the deceased child, which was 14 months old, was taken ill with whooping cough; that a doctor was not called in to attend it; that an elder of the Peculiar People prayed over it and annointed it with oil, but that the child afterward died of pneumonia and bronchitis. Darling, J., instructing the jury, said:

"The speech made by the male defendant [he conducted his own defense] is of a most fatalistic character. Not only would he not call in a doctor, but he left his case to-day absolutely in the hands of the Lord. He did not want any counsel, but said the Lord Jehovah would get a proper verdict. At least, so I understood it. Although the conclave of the Peculiar People had decided that a physician was not to be called in in the case of sickness, it had not yet considered the case of a surgeon. The evidence was that none of the Peculiar People had yet had broken bones, but when a case of that kind happened they would have a conclave, which would determine whether the Lord could set bones, or whether He could not. It is the duty of parents to provide medical aid for their children. A child did not know anything about the tenets of the Peculiar People. While a child is of tender years and could not choose for itself, the law protects it. If the defendants neglect the duty which the law imposes upon them—the duty of calling in medical aid for the child—and death is thereby caused or accelerated, they are guilty of the charge made against them."

These cases establish the principle that a person who willfully and knowingly refuses to furnish necessary medical attendance to his minor child, when he knows it to be dangerously ill, disobeys the statute before us, without regard to the question whether or not he acted in obedience to his religious convictions, and that the statute is not offensive to the article of the Constitution as to liberty of conscience.

The sixth point raises the question of fact whether there was anything in the child's illness to necessitate medical attendance. The evidence showed that the child had whooping cough, which eventuated in catarrhal or bronchial pneumonia many hours before its death. Conceding that the statute was not applicable to a case of whooping cough, it does apply to a case where so serious a disease as pneumonia supervenes. The dangerous character of this disease is of common knowledge. The defendant admitted that he "observed that the symptoms were of a dangerous character" about 48 hours before the child's death, and that notwithstanding this he deliberately chose not to obtain medical assistance, because to do was not according to his religious belief; that he would be willing to go to prison rather than use medicine. The utmost that could be said in his favor is that there was a question of fact, whether he knew the dangerous condition of the child, and, knowing it, refused to furnish medicine or medical attendance; and the court distinctly submitted this question to the jury. The finding of the jury is that he had such knowledge, and refused to obey the statute.

As to the eighth and ninth points: There was evidence that whooping cough and pneumonia are curable. When the defendant, knowing the dangerous condition of the child, deliberately chose not

to call medical assistance, he elected to disobey the imperative provisions of the statute, and assumed the risk of such refusal. In Lewis v. Long Island R. Co., 162 N. Y. 52, 56 N. E. 548, the court held that proof of a refusal to obey a positive requirement of a statute was admissible in evidence, and might constitute actionable negligence and justify a recovery where the injury has been caused by it. In The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148, it was held that, where a vessel at the time of a collision is in actual violation of a statutory rule intended to prevent a collision, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least contributory to the disaster. A still stronger announcement of the principle is found in The Martello, 153 U. S. 64, 14 Sup. Ct. 723, 38 L. Ed. 637, in which the court held that, where a vessel failed to carry the lights prescribed by the statute, that vessel must be held to blame, unless she could show that the defect "could not by any possibility have contributed to the collision." This principle applies to the case at bar. The defendant willfully and intentionally refused to obey the statute and call in medical assistance, although he knew that the child was dangerously ill, of a sickness which there is evidence to show is curable, and the child died of that disease. This was evidence sufficient to require the court to submit to the jury the question whether medical attendance would have been beneficial to the child, and whether the death resulted from the failure to call it, and the court fairly instructed the jury upon the subject in the language heretofore quoted. The verdict is sustained by sufficient evidence.

I have carefully examined the exceptions to the charge, and find no error. I think the judgment should be affirmed.