## THE SYLVAN ARROW.

### THE KATRINA LUCKENBACH.
### No. 284.

Circuit Court of Appeals, Second Circuit.
May 22, 1939.

Macklin, Brown, Lenahan & Speer, of New York City (Chauncey I. Clark, Paul Speer, and Adrian J. O'Kane, all of New York City, of counsel), for appellant.

Raymond E. Stefferson and Edwin .M. Bourke, both of New York City, for appellee.

Before SWAN, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

SWAN, Circuit Judge.

This litigation resulted from a collision between the steamships Sylvan Arrow and Katrina Luckenbach in Ambrose Channel on the night of January 13, 1932. The owner of each vessel filed a libel against the other. The suits were tried together and the Sylvan Arrow was held solely at fault. Her owner, Standard Vacuum Transportation Company, has appealed from a decree dismissing its libel and awarding recovery upon the libel of Luckenbach Steamship Company.

The collision occurred in the upper leg of Ambrose Channel at 11:03 P.M. according to the Luckenbach's time and at 10:57½ according to the Sylvan Arrow's time. The latter vessel, a 10,000 ton single-screw tank steamship, was inbound from Texas with a cargo of oil. The Luckenbach, a 10,000 ton twin-screw turbine vessel, was outbound from Brooklyn to Pacific Coast ports with a general cargo. Both vessels were damaged, and the Sylvan Arrow lost part of her cargo of oil. When the Sylvan Arrow entered Ambrose Channel visibility was good, but low-hanging fog was encountered at buoy 10, the junction between the first and second legs of the channel. She proceeded close to her starboard side of the channel, locating each of the buoys on that side by sight and by sound, until buoy 14 was reached, the junction between the second and third legs. When this buoy was located by sound about 200 feet off the starboard bow the vessel's course was changed to N ¼ W, which is the correct course for the third leg of the channel. She was proceeding at slow speed, about three knots, and was sounding fog signals. Buoy No. 16 was neither seen nor heard, which led the district judge to think that the Sylvan Arrow overran her course and got too far to the westward. At 10:53 P.M. she sighted the mast head and range lights of a vessel that proved to be the Luckenbach about half a point on her port bow. Her master thought that the vessels were in position to pass port to port, and testified to sounding a one blast passing signal which he says was answered by one blast, but the Luckenbach denies blowing a passing signal. The lights of the approaching vessel were immediately shut out by fog and so remained until 10:56, when both the range lights and the running lights came into view and she appeared to be heading for the Sylvan Arrow's bridge, but swinging to starboard. In an effort to swing the Sylvan Arrow's stern away, her engines were put full speed ahead under a hard left rudder; but the maneuver did not succeed. About half a minute later the vessels came together, the bow of the Luckenbach striking a glancing blow which cracked the plates on the port side of the Sylvan Arrow at her No. 8 tank, slightly aft of amidships, and crushed and bent to starboard the stem of the Luckenbach.

Each vessel contends that the collision occurred in her waters, that is, that the other vessel was on the wrong side of the channel. According to the Luckenbach's testimony, she heard a fog whistle on her starboard bow at 10:59 (her time) and shortly thereafter a white light was seen five or six degrees off her starboard bow. The light appeared to broaden until it reached twenty to twenty-five degrees on the starboard bow. Capt. Martens thought the vessels would pass safely starboard to starboard. One minute before collision

the bearing of the light on the approaching vessel appeared suddenly to swing from starboard to port across the bow of the Luckenbach. Her engines were then put full speed astern under a hard right rudder to swing the bow to starboard, but it was too late. Capt. Martens placed the collision about 500 feet off the westerly line of buoys and some 1,200 or 1,300 feet north of buoy No. 15.

Immediately after the collision the Sylvan Arrow dropped her port anchor and the anchorage bearings taken shortly thereafter showed her to be slightly on the easterly side of the channel and about 1,000 feet below buoy No. 18. The Luckenbach, which also dropped anchor, took no anchorage bearings. The district judge concluded that the anchored position of the Sylvan Arrow might be accounted for by her own momentum and the force of the impact, and that the place of collision was on the westerly side of the channel. He found that she probably overran her course at buoy No. 14, got somewhat on the westerly side of the channel and, when she realized this, changed her course to bring her back to her own easterly side. The district judge did not believe, nor do we, that she was ever so far to the west as to appear twenty or twenty-five degrees on the Luckenbach's starboard bow, but he held that she had gotten out of her own waters and had crossed the bow of the Luckenbach. For this she was condemned, while the latter was exonerated.

 Assuming for the moment that the collision occurred somewhat to the west of the center line of the channel we do not think the Luckenbach was faultless. She saw a bank of fog in the channel below buoy No. 15 (more than two miles away) when she was passing Craven Shoals buoy at 10:50 P. M.; she continued for six minutes at full speed, 13 knots over the ground against a one knot tide, until one-half mile above buoy 17, when she reduced to half speed, nine knots. Two minutes later, at 10:58, her engines were put at slow, a speed of five to six knots, and at 10:59, when the Sylvan Arrow's fog whistle was heard on the starboard bow, they were stopped. They remained stopped for three minutes, and were then reversed, when the Sylvan Arrow was seen crossing her bow. The collision occurred one minute after. The district judge was in error in finding that the Luckenbach did not see a low fog bank ahead until 10:56, when one-half mile

above the entrance to Ambrose Channel. Her master's report to the local inspectors admitted seeing it when passing Craven Shoals buoy at 10:50 and this he confirmed on cross-examination. Nevertheless, he continued for six minutes at full speed, covering one and seven-tenths miles in eight minutes, and entering the fog at buoy 17 at better than nine knots an hour. This was too fast. Capt. Martens admitted that at half speed the Luckenbach could not be stopped in less than 450 yards, three times the range of visibility of a vessel's running lights in the then existing fog conditions. It is 1,310 yards from buoy No. 17 to buoy No. 15; and, as Capt. Martens placed the collision about 1,300 feet above No. 15, his vessel must have gone 2,600 feet in five minutes, with her engines in reverse during the last minute. This was an average of more than five knots. Clearly this was too fast when the visibility of the side lights of an approaching vessel was not over 400 feet. The Nacoochee, 137 U.S. 330, 11 S.Ct. 122, 34 L.Ed. 687; The Martello, 153 U.S. 64, 14 S.Ct. 723, 38 L.Ed. 637; Lie v. San Francisco & Portland Steamship Co., 243 U.S. 291, 37 S.Ct. 270, 61 L.Ed. 726; The Kronprinz Wilhelm, 2 Cir., 186 F. 324; The El Monte, D.C.S.D. N.Y., 114 F. 796; The City of Atlanta, D. C.S.D.N.Y., 26 F. 456. When she saw the white lights but not the running lights of the Sylvan Arrow four minutes before the collision, she should have reduced her speed more than would be effected by merely stopping her engines. As this accident itself demonstrates, it is not safe seamanship in fog, when only the white lights of an approaching vessel are visible and indicate a narrow clearance for passing, for a vessel to continue on without determining the heading of the other by her running lights. For this fault of navigation we think the Luckenbach should be condemned. Whether she was guilty of further faults in not having gone to anchorage instead of entering the channel in which fog was seen ahead, or in not starting her fog whistles earlier than she did, we need not consider.

 If the place of collision was, as the district judge fixed it, on the westerly side of the channel, the fault of the Sylvan Arrow is plain. Very likely she did overrun her course at buoy No. 14 since No. 16 was never seen nor heard, and her master entertained a misconception as to the set of the tide. Upon this record we do not

feel at liberty to change the court's finding as to the place of collision; but if we were to do so, the result would not be different. Even if the Sylvan Arrow were on her own side of the channel, she was guilty of the same fault as the Luckenbach. When she saw its white lights but not its running lights, she should have stopped her engines and reduced speed. This is particularly true in view of the admission of her master that the apparent course of the Luckenbach would bring her close to the port side of the Sylvan Arrow and the further fact that the lights of the Luckenbach were then blotted out by the fog until about a minute before the collision when her running lights were observed and she was seen to be heading straight for the Sylvan Arrow. An accident was then inevitable. Although the Sylvan Arrow's speed was only three knots, it was still too fast for her to stop her way after the running lights became visible. Until she knew the heading of the approaching vessel it was dangerous to continue on.

The decree is modified to hold both vessels.